| | | |
|---|---|---|
| ACCOLADE SYSTEMS LLC | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| vs. | § | **CASE NO.  6:07 CV 48** |
| | § | **PATENT CASE** |
| CITRIX SYSTEMS, INC. | § | |
| | § | |
| **Defendant** | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

This Claim Construction Opinion interprets the disputed terms in claim 1 of United States Patent No. 7,130,888 ("the '888 patent").  Appendix A contains the disputed terms, as they appear in the claims of the '888 patent.  Appendix B contains a chart summarizing the Court's constructions and the parties' agreed constructions.  Additionally, the Court **DENIES** Accolade's Motion to Reconsider (Docket No. 124) as moot.

## BACKGROUND

Plaintiff Accolade Systems LLC ("Accolade") accuses Citrix Systems, Inc. ("Citrix") of infringing claims of the '888 patent.[1]  The '888 patent discloses a method and apparatus for controlling a computer over a Transmission Control Protocol/Internet Protocol ("TCP/IP") network.  The prior art included network capability that permitted programs, known as "applets," to be transferred over the Internet and run on a user's computer, regardless of the local machine's

---

[1]The Court held a *Markman* Hearing when Citrix and Webex Communications, Inc. ("Webex") were co-defendants.  Claims against Webex have since been dismissed.  Order of Dismissal with Prejudice, Docket No. 171. The jointly submitted arguments will be referred to as Citrix's arguments in this memorandum opinion.

operating system or hardware. Applets, however, are limited in function because they are small, typically transient programs designed for specific tasks. The '888 patent's invention improves upon the prior art, allowing virtually the entire functionality of a computer system to be made accessible to a wide area network through the exchange of encrypted TCP/IP data packets. Through this exchange, a client computer can run a host computer through a web page provided at a web site on the World Wide Web.

The Court issued an Order on the Court's preliminary determination of disputed terms of the '888 patent. Docket No. 116. Accolade filed a Motion to Reconsider Preliminary Claim Constructions. As the Court's initial claim constructions were preliminary in nature, the Court **DENIES** Accolade's motion as moot.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular

claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very

instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning

because claim terms are typically used consistently throughout the patent. *Id*. Differences among

the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a

dependent claim adds a limitation to an independent claim, it is presumed that the independent claim

does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he

specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive;

it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v.

Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299

F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give

a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the

claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs.

*Id*. Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed

meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be

ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the

specification may aid the court in interpreting the meaning of disputed claim language, particular

embodiments and examples appearing in the specification will not generally be read into the

claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting

*Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*,

415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

## CONSTRUCTION OF DISPUTED TERMS IN THE '888 PATENT

**controlling a computer**

Claims 1-18 contain the term "controlling a computer" in the preamble. Accolade contends that the body of the claim sets out the complete invention, and the preamble does not constitute or explain a claim limitation and therefore should not be construed. Alternatively, Accolade argues that "controlling a computer" means "providing input to a computer." Citrix contends that the term means "taking over the entire functionality of a host computer," and alternatively, "taking over all of the functionality of a host computer that can be controlled by a mouse or keyboard." The parties

dispute whether "controlling a computer" is a limitation even though it is found only in the preamble, and if it is a limitation; whether the term limits the claimed invention to taking over all of the functionality of a computer; whether "controlling a computer" is accomplished only by a mouse or keyboard; and whether "a computer" is the "host computer." The Court construes "controlling a computer" as "taking over the functionality of the host computer that is responsive to an input device event received from a client computer."

The parties dispute whether "controlling a computer" in the preamble is a limitation. "Clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-9 (Fed. Cir. 2002) (citations omitted). On several occasions, the applicant relied on "controlling" a computer to distinguish the claimed invention from the prior art. *See* Defs.' Br., Ex. 11 (8-13-01 Amendment C), 7; Defs.' Br., Ex. 15 (2-25-04 Amendment E), 9; Defs.' Br., Ex. 13 (6-18-02 Amendment D), 6. In each of these amendments, the applicant distinguished the claimed invention from the prior art by referring to the claimed invention's characteristic of controlling a host computer.[2] Accordingly, "controlling a computer" is a limitation.

---

[2]The applicant stated in its amendments:

"Frese teaches a method for remotely controlling an application program over a network. It does not allow for the remote control of a computer system computer system [sic] a network as does Applicant's invention." Defs.' Br., Ex. 11 (8-13-01 Amendment C), 7.

"Frese uses a downloaded client program and a network browser program, but only to control a *specific demonstration program* running on a host computer. As such, it does not *take over the functionality of the host computer*, but simply runs a demonstration copy of an application program being offered for sale. Claim 1, as amended, specifies that the client program that is run in conjunction with the browser program encrypts the event data of the client computer and decrypts encrypted image information set by a host computer." Defs.' Br., Ex. 15 (2-25-04 Amendment E), 9.

However, Citrix's construction creates limitations that are not supported by the intrinsic record. Citrix asserts that "controlling a computer" means that the "entire functionality," or in the alternative, "all of the functionality" of a host computer is controlled. Neither the patent nor the prosecution history suggest that the claims cover only situations where all of the functionality of the host computer is controlled. The prosecution history distinguishes the prior art stating only that "[Frese] does not allow for the remote control of a computer system," "[Frese] does not *take over the functionality of the host computer*," "Doyle does not teach the control the basic functionality of a host computer," and "[Popp] only allows the access of application programs on remote computers, rather than controlling the basic functionality of the computers." Defs.' Br., Ex. 11 (8-13-01 Amendment C), 7; Defs.' Br., Ex. 15 (2-25-04 Amendment E), 9; Defs.' Br., Ex. 13 (6-18-02 Amendment D), 6. The most limiting of these statements, "take over the functionality" and "control the basic functionality," do not require "taking over *all* of the functionality." Thus, Citrix's construction is too limiting as unsupported by the intrinsic record.

Citrix also proposes that "controlling a computer" is accomplished "by a mouse or keyboard." However, adding "keyboard" to the Court's construction would be repetitive of what is already in the claim. Claim 1 already states, "a client computer coupled to said TCP/IP protocol network, said client computer having a monitor, a keyboard, and a pointing device." Col 13:44-46. In regards to adding "a mouse" to the Court's construction, intrinsic evidence gives a broader

---

"It is therefore very clear that Doyle does not teach the [sic] control the basic functionality of a host computer but, rather, specific applications running on remote computers." Defs.' Br., Ex. 13 (6-18-02 Amendment D), 6.

"Furthermore, the invention of Popp is very similar to that of Doyle in that it only allows the access of application programs on remote computers, rather than controlling the basic functionality of the computers." *Id.*

meaning to "controlling a computer" than Citrix proposes. The patent uses the language, "a pointing device," in claim 1, Col. 13:46, and references to "a mouse" in the specification are only exemplary.[3] Thus, the intrinsic record does not support limiting the invention to a mouse, and the Court does not include "a mouse" in its construction.[4]

The parties also dispute whether "a computer" is the host computer. "A computer" in "controlling a computer" refers to the host computer as described in the intrinsic record. Claim 1 claims a client computer, which includes a monitor and an input device, and a host computer, which is capable of being accessed by the client computer and is in fact initially accessed by the client computer. *See* Col. 13:44-14:15. Claim 1 states, "said host computer running a host program that is responsive to said keyboard and said pointing device due to the event data in the event queue." Col. 13:64-66. The event data is transmitted by a client computer. *See* Col. 13:53-55. Also, the specification refers to the host computer as capable of being accessed/controlled. *See* Abstract; *see* Col. 6:23-25; *see* Col. 9:31-33. For instance, the Abstract explains that "[h]aving the host computer posted on a web page creates a 'virtual computer' that can be view [sic] and/or controlled by the client computers." Furthermore, the prosecution history is consistent with the claim language and specification, stating, "Doyle does not teach the control the basic functionality of a host computer but, rather, specific applications running on remote computers." Defs.' Br., Ex. 13 (6-18-02

---

[3] *See, e.g.*, Col. 3:43-46 ("Alternatively, the client computer can be used to both monitor the screen of the host computer and to provide inputs to the host computer via a keyboard, mouse, *or other input device*") (emphasis added); *see, e.g.*, Col. 5:34-37 ("Each of the computer systems 14-18 *typically include* . . . , a keyboard, and a "pointing" device such as a mouse 30) (emphasis added); *see, e.g.*, Col. 10:38-43 ("a client computer can 'control operations' of the host computer as if the keyboard, mouse, *etc.* of the client computer were directly coupled to the host computer. Of course, keyboards and mice . . . are *just two instances* of input devices") (emphasis added).

[4] While claim 1 does not require a mouse, it does require a keyboard because "having . . . a keyboard" is expressly stated in the claim, and the Court does not read out this aspect of the invention. However, the "comprising" language of claim 1 permits other input devices to be used with the invention in addition to a keyboard.

Amendment D), 6; *see also* n.2.  While the applicant did not unequivocally limit "computer" to "a

host computer" in distinguishing Doyle, the consistent references in the prosecution history, *see* n.2

*supra*, and throughout the patent to controlling a host computer support the limitation.  Given the

relationship between the host and client computers stated in claim 1 and the intrinsic record, the

computer controlled is the host computer.  Accordingly, the Court construes "controlling a

computer" as "taking over the functionality of the host computer that is responsive to an input device

event received from a client computer."

## client computer

Claims 1, 4-8, 10, 11, 13, 17, and 18 contain the term "client computer."  Accolade contends

that "client computer" does not require construction and is defined by the limitations in the claim

and alternatively argues that the term means "computer used to interact with the host computer."

Citrix contends that "client computer" means "the computer accessing the host computer."  The

parties dispute whether construction is necessary, whether the client computer accesses or more

broadly interacts with the host computer, and whether the claim language allows for a plurality of

client computers.

A construction is appropriate to clarify to the jury which computer in the claimed invention

is performing the accessing and which is being accessed, and the Court construes "client computer"

as "a computer accessing the host computer."[5]  Claim 1 refers to the client computer as accessing

the host computer: "a host computer coupled to said TCP/IP protocol network and being capable of

*being accessed by said client computer* . . . wherein said host computer is initially *accessed by said*

---

[5]The Court's construction also addresses the parties' dispute on whether the client computer accesses or
more broadly interacts with the host computer.

*client computer*." Col. 13:59-14:8 (emphasis added). Also, the Abstract and Disclosure of the Invention state, "The computer 'posted' on the web page is referred to as the 'host' or 'advertiser' computer, and computers accessing the host computer are referred to as 'client' or 'user' computers." Abstract; Col. 3:28-31. Thus, the intrinsic record shows that a client computer accesses the host computer.

In regards to the parties' dispute on whether the claim language allows for a plurality of client computers, the Court modifies its earlier preliminary construction of "client computer" and construes this term using the indefinite article "a" when referring to "computer" to allow for a plurality of client computers. The Federal Circuit has stated,

> "[a]n indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" That "a" or "an" can mean "one or more" is best described as a rule, rather than merely as a presumption or even a convention. The exceptions to [the "indefinite article"] rule are extremely limited: a patentee must "evince [ ] a clear intent" to limit "a" or "an" to "one." The subsequent use of definite articles "the" or "said" in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning. An exception to the general rule that "a" or "an" means more than one only arises where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule.

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008) (citations omitted). Claim 1 uses the open claim term "comprising" and initially refers to "client computer" as "a client computer" and subsequently refers to "said client computer." Col. 13:44-Col. 14:14. The "indefinite article" rule treats the use of "comprising" combined with the initial use of "a" to mean "one or more." Also, the subsequent use of "said" to refer to "client computer" only reinvokes the "one or more" meaning of "client computer." Thus, under the "indefinite article" rule, "client computer" allows for a plurality of client computers.

Citrix argues that an exception to the "indefinite article" rule applies, proposing that "client computer" should be construed as "the client computer" because claim 18 expressly requires a plurality of client computers and claim 1 does not. Citrix is apparently referring to the principle of claim differentiation—"when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *See Phillips*, 415 F.3d at 1314-15. First, claim differentiation is merely a presumption; it is not a hard and fast rule. Second, claim 1 and claim 18 are sufficiently different in scope. Claim 18 requires more than one client computer coupled to the host computer. Claim 1 requires one or more client computers coupled to the TCP/IP protocol network. Thus, claim differentiation does not support limiting "client computer" to a single client computer. Accordingly, the Court construes "client computer" as "a computer accessing the host computer."

**client program**

Claims 1, 3, and 4 contain the term "client program." Accolade contends that "client program" means "a set of instructions for execution by a client computer by, for example, a browser program or the operating system." Citrix contends that the term means "a script for execution by a browser program on, or the operating system of, the client computer," or alternatively, "a script for execution by a client computer by, for example, a browser program or the operating system." The parties dispute the scope of "client program" as the term relates to "script."

The Court construes "client program" as "a set of instructions for execution by a client computer." The specification provides guidance on the relationship between "script" and "client program," stating that "the script . . . will be referred to *generically* as a 'client program.'" Col. 7:63-64 (emphasis added). Given the language "generically," the specification describes "script"

as a species of the genus "client program."  Accordingly, "client program" presumably encompasses more than "script" and thus cannot be limited to "script."

The prosecution history also refers to "client program" generically:

It is well known in the art that *scripts may be executed on browsers capable of running a script language*, such as Java.  An advantage to having the browser run the client program is that the client program can be platform independent.  Running a client program on an operating system requires platform specific code.  In contrast, *client programs run in browsers no longer must communicate with the operating system directly, and thus may run on any system capable of running a script enabled browser.*

Defs.' Br., Ex. 7 (08-6-99 Amendment), 3-4 (emphasis added).  The prosecution history establishes that a client program structured as a script is not compiled to code executable on a particular operating system platform.  Instead, a client program structured as a script is executed at run time using an interpreter program.  A client program structured as a script can be run on a script-enabled browser, but a client program can also be code that is specifically compiled to be executable on a particular operating system platform.  Accordingly, the full scope of the generic term "client program" extends to a set of instructions for execution on a client computer.

Citrix's proposed construction is overly limiting because it restricts "client program" to a particular implementation of "client program" disclosed in the specification—"script."  Accolade's construction, on the other hand, is consistent with the description in the specification and the prosecution history that "client program" is generic to a script executed by an interpreter (script engine) and to a set of instructions that is compiled to code specifically executable on an operating system platform.  Thus, the Court modifies its preliminary construction and construes "client program" as  "a set of instructions for execution by a client computer."

**being delivered**

Claim 1 contains the term "being delivered." Accolade contends that "being delivered" means "having been transmitted." Citrix contends that "being delivered" means "transmitted from the host computer." The parties dispute whether "being delivered" indicates that the client program must originate from the host computer.

"Being delivered" does not require construction. The intrinsic record does not give any specialized meaning to "being delivered," and the plain meaning of "being delivered" is clear from the words of the term. "Being delivered" in the context of the claimed invention simply means changing the location of the client program from one place to another. Lay jurors would not need this explanation of what "being delivered" means, and offering a construction could only complicate the already clear and well understood language used in the term.

Both Accolade's and Citrix's constructions would work more to confuse rather than to clarify the meaning of "being delivered." The parties propose "having been transmitted" and "transmitted from the host computer." These constructions are taken from the specification that states, "Since the script [client program] is transmitted over the TCP/IP network." Col. 7:60-61. However, "transmitted" does not establish any special meaning for "being delivered." "Transmitted" is simply a synonymous way to say that the client program is "being delivered." Also, "transmitted" is not preferable language to use in construing "being delivered" because  "transmitted" will likely be harder for lay jurors to understand than the simple language of the term "being delivered." "Being delivered" has a plain meaning that is already readily understood by lay jurors; thus, the Court does not construe "being delivered."

The parties disagree on whether the client program must originate from the host computer.

The intrinsic evidence does not support limiting the claimed invention to require that the client program originate from the host computer. Claim 1 does not use any language requiring the client program to originate from the host computer, and the specification expressly states that the client program can be transmitted "alternatively, by another server on the Internet 12." Col. 7:61-62.

The prosecution history does not show that the host computer must deliver the client program. Citrix cites to the prosecution history, which states, "Independent claim 1 claims an apparatus for remotely controlling a host computer via a web browser on a client computer. An applet or equivalent is *downloaded from the host computer* to the client computer to permit this functionality." Defs.' Br. 30. However, the language cited by Citrix does not create a limitation where only the host computer delivers the client program. Stating that the client program "is downloaded form the host computer" does not require the host computer to exclusively deliver the client program. When read in context of the applicant's office action response, it becomes apparent that the applicant did not require the host computer to deliver the client program. The sentence following Citrix's excerpt states, "As such, *no software is required at the client computer* other than the browser software, which comes standard with virtually every personal computer that is sold." Defs.' Br., Ex. 13 (6-18-02 Amendment D), 4 (emphasis added). The applicant then distinguished Doyle, stating, "*Doyle requires software to be installed* upon the client machine in order for the browser to control remote applications." *Id.* at 5 (emphasis added). The applicant sought to distinguish Doyle based on whether the client computer requires software, not whether the host computer exclusively delivers the client program. Thus, the applicant did not rely on the host computer exclusively delivering the client program to distinguish the claimed invention from the prior art. As such, Citrix's excerpt from the prosecution history does not demonstrate a limitation

13

on the claimed invention.

**encrypted event data**

Claim 1 contains the term "encrypted event data." Accolade contends that "encrypted event data" means "information representing an action or occurrence coded to be unintelligible without decoding information, commonly a key or a password." Citrix contends that the term means "the event data that was encrypted by the client program."

The Court construes "encrypted event data" as "event data coded to be unintelligible without decoding information, commonly a key or a password." The parties' main dispute is whether the client program encrypts the encrypted event data. Claim 1 itself states, "said *client program encrypting event data* and transmitting said *encrypted event data* over said TCP/IP protocol network." Col. 13:53-55 (emphasis added). Thus, claim 1 expressly requires that the client program encrypts event data. Because it is not necessary to repeat in the claim construction what is already clarified in the claims, the Court accordingly constructs "encrypted event data" without reference to a client performing the encryption. Furthermore, the Court applies Accolade's language "unintelligible without decoding information, commonly a key or a password," which will help the jury to understand what is meant by "encrypted." "Event data" does not require further construction because lay jurors would understand the plain meaning of "event data" as simply information regarding an event. The intrinsic evidence does contradict this plain meaning. Accordingly, the Court construes "encrypted event data" as "event data coded to be unintelligible without decoding information, commonly a key or a password."

**host computer**

Claims 1, 4-9, 13-15, 17, and 18 contain the term "host computer." Accolade contends that

14

"host computer" is defined by the limitations in the claim language and thus does not need construction. Alternatively, Accolade argues that the term means "computer system available to interact with client computer." Citrix contends that "host computer" means "a computer posted on a web page." The parties dispute whether construction is necessary and whether the "host computer" is necessarily posted on a web page.

"Host computer" does not require construction. The claim language itself delineates the limitations of "host computer." Claim 1 states, "a host computer coupled to said TCP/IP protocol network and being capable of being accessed by said client computer." Col. 13:59-61. The claim then continues for twelve lines expressly stating the limitations of "a host computer." It is not necessary to restate limitations in a construction when the limitations are already clarified in the claim. Thus, the Court does not elaborate on such limitations with regards to "host computer" and accordingly does not construe this term.

The parties dispute whether "host computer" is necessarily posted on a web page. The intrinsic evidence does not support requiring the host computer being posted on a web page. Claim 1 shows only that the host computer is initially accessed through a web page while not requiring that the host computer be posted on a web page. Claim 1 states, "said *host computer is initially accessed by said client computer through a web page* accessible over said TCP/IP protocol network." Col. 14:7-9 (emphasis added). The claim makes no mention of the host computer being "posted" and instead states that the host computer is "initially accessed." *Id.* Thus, the definition for "post" in the specification that Citrix urges does not apply. *See* Col. 9:23-34. Also, the specification refers to the host computer being posted but does not expressly require it:

A host computer system . . . *can be 'posted' onto an 'advertising' web page* at the web site to permit other computers coupled to the Internet to interact directly with the host computer system. The computer *'posted' on the web page is referred to as the 'host'* or 'advertiser' computer . . . . Having *the host computer posted on a web page* creates a 'virtual computer' that can be view [sic] and/or controlled by the client computers.

Col. 3:23-33 (emphasis added); *see also* Abstract. Although the specification makes several references to the host computer being posted on a web page, it does so stating only the possibility that the host computer "can be posted" on a web page. Thus, neither claim 1 nor the specification offer support for requiring that the host computer be posted on a web page. Accordingly, claim 1 does not require that the host computer is posted on a web page.

**host computer . . . being capable of being accessed by said client computer**

Claim 1 contains the term "host computer . . . being capable of being accessed by said client computer." Accolade contends that the term should be given its plain and commonly understood meaning and does not need construction. Alternatively, Accolade argues that "host computer . . . being capable of being accessed by said client computer" means "host computer . . . being able to interact with the client computer." Citrix contends that the term means "all the functionalities of the host computer are capable of being displayed on and run from the client computer." The parties dispute whether "access" means access to all the functionalities of the host computer. The Court resolved this dispute in the Court's discussion on "controlling a computer." Access means taking over the functionality of the host computer, but not necessarily all the functionality of the host computer.

"Host computer . . . being capable of being accessed by said client computer" does not require construction. The claim itself delineates the limitations of this term. Following "host

computer . . . being capable of being accessed by said client computer," Claim 1 states, "said host computer being capable of receiving and decrypting encrypted event data and placing said decrypted event data in an event queue of said host computer." Col. 13:61-64. The claim then continues for the next nine lines addressing the way that the host computer is capable of being accessed by the client computer. It is not necessary to restate limitations that are already clarified in the claim language. Claim 1 clarifies the term limitations, and thus a construction is not necessary.

**event queue**

Claim 1 contains the term "event queue." Accolade contends that "event queue" means "list of event information waiting to be processed on a computer." Citrix contends that the term means "a memory within a computer that stores a sequence of events to be executed by the computer," and alternatively, "a series of messages or jobs waiting to be processed automatically one after the other by a computer system." The parties dispute whether limitations included in Citrix's constructions are supported by the '888 patent.

The Court construes "event queue" as "event data waiting to be processed on a computer." The Court adopts Accolade's construction but substitutes "event data" in place of "list of event information." The Court uses "event data" because claim 1 applies that particular language, and "event data" does not require further explanation because lay jurors would understand the plain meaning of "event data" as information regarding an event.

The Court does not use Citrix's construction because the intrinsic evidence does not support the language Citrix uses. Citrix's first construction states "memory," "stores a sequence of events," and "to be executed by the computer." Citrix's compromise construction states "a series of messages or jobs," "automatically," "one after the other," and "by a computer system." Claim 1 does not

define "event queue" using any of Citrix's proposed language, and Citrix's brief does not otherwise provide support with any intrinsic evidence. The Court thus does not apply the limitations asserted in Citrix's constructions. Accordingly, the Court construes "event queue" as "event data waiting to be processed on a computer."

**host program**

Claim 1 contains the term "host program." Accolade contends that "host program" means "a set of instructions executed on the host computer." Citrix contends that the term means "an application program executed by the operating system of the host computer." The parties dispute whether the host program must be executed by an operating system.

The Court construes "host program" as "a set of instructions for execution by the host computer," substantially adopting Accolade's construction. "Program" has the commonly understood meaning of "a set of instructions" and is not given a special definition in the intrinsic evidence. "A set of instructions" conforms to the dictionary definition for "program," "A detailed and explicit set of directions for accomplishing some purpose, the set being expressed in some language suitable for input to a computer, or in machine language." MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 1680 (6th ed. 2003); *see also* THE AMERICAN HERITAGE SCIENCE DICTIONARY 504 (1st ed. 2005) ("A[n] organized system of instructions and data interpreted by a computer"). Furthermore, "host" modifies "program" in "host program," and the Court construes the modifying term "host" to mean "execution by the host computer." This is consistent with the specification, which states, "In FIG. 5, the virtual machine application 48 of FIG. 2 is illustrated in greater detail. This process will also be referred to as the 'host program[,]'[] since it runs on the host." Col. 10:12-14. The commonly understood meaning of "program" and the

specification thus support the Court's construction.

Citrix argues that the host program must be executed by an operating system. However, no support in the intrinsic record exists for Citrix's proposed limitation. Citrix recites, "In FIG. 5, the virtual machine *application* 48 of FIG. 2 is illustrated in greater detail. This process will also be referred to as the *'host program[,]'* [] since it runs on the host. The process 48 is an *application program running on the computer system, e.g. on a Macintosh* computer system, on a WINTEL computer system, on a workstation, etc." Defs.' Br. 27 (emphasis added by Citrix) (citing Col. 10:12-17). However, this excerpt only states that the program runs on a "computer system," not necessarily an operating system. Also, even if the Court considered "Macintosh computer system" and "WINTEL computer system" as operating systems, "e.g." precedes such language rendering the systems examples rather than limiting references.

Citrix also cites, "In the process 42 of FIG. 2, an *operating system of the host* supports a 'system 44 extension' 46, a virtual machine application 48, and a Java Applet script 50. . . . The virtual machine application 48 is a computer program or 'process' running from a host computer system, such as computer system 14." Defs.' Br. 28 (citing Col. 7:4-30) (emphasis added by Citrix). While this excerpt refers to "an operating system of the host" that supports a computer program running from the host computer, it does not require that an operating system must execute the host program. Thus, the intrinsic record does not support limiting "host program" to being executed by an operating system. Accordingly, the Court construes "host program" as "a set of instructions for execution by the host computer."

**video buffer image within said host computer**

Claim 1 contains the term "video buffer image within said host computer." Accolade

19

contends that "video buffer image within said host computer" means "information stored within the host computer which can be used to display an image." Citrix contends that the term means "a bit mapped (or pixel mapped) version of the image currently displayed on the screen of the host computer that is stored in memory of the host computer." Alternatively, Citrix argues that the term means "a bit mapped (or pixel mapped) version of the image currently displayed on the screen of the host computer, if it has one, that is stored in memory of the host computer." The parties generally dispute the limitations found in their proposed constructions. The Court preliminarily construed the term as "the bit mapped (or pixel mapped) version of the image currently displayed on the screen of the host computer, if it has one, that is stored in memory of the host computer."

In light of further consideration, the Court modifies its earlier preliminary construction of "video buffer image within said host computer" and construes this term as "video image data that is stored in memory within the host computer and is currently available for display." The Court does not adopt Citrix's proposal that includes "bitmapped (or pixel mapped)." Citrix's supporting excerpt from the specification states, "The *actual image is taken from the video buffer of the host computer* within the range specified by the rectangle. Preferably, *the bit mapped (or pixel mapped) image taken from the video buffer* is compressed . . . before transmission over the internet." U.S. Patent No. 7,100,069 Patent ("the '069 patent") (incorporated by reference into the '888 patent, col. 1:13-19), col. 13:7-13 (emphasis added).[6] While this excerpt makes reference to an image being "bit mapped (or pixel mapped)," the language used does not reach the level of creating a limitation. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d 1318 (Fed. Cir. 2003) (declining to limit

---

[6]The '888 patent makes reference to U.S. Patent Application Ser. No. 08/798,703, which became the '069 patent. *See* Defs.' Br. 37 n.11. Both parties refer to the '069 patent. *See id.*; Pl.'s Reply Br. 14.

the claims from language in the specification where there was no indication in the written description that the patentee acted as her own lexicographer and there was no express disclaimer). The '069 patent reference does not provide any evidence of disclaimer or that the patentee acted as his own lexicographer. Thus, the Court does not adopt "bit mapped (or pixel mapped)" in its construction.

The Court also modifies Citrix's proposed language "currently displayed," and instead uses "currently available for display." The prosecution history states, "The present invention also teaches transmitting image information from the host computer to the client computer whereby the image information includes a portion of the video buffer image of the host computer. In this manner, the client program of the client computer may simulate the monitor of the host computer." Defs.' Br., Ex. 9 (11-13-00 Amendment B), 6. This language indicates that the invention includes an ability to display on the client computer the image currently being output for display on a monitor connected to the host computer, and thereby simulate the monitor of the host computer. Also, the fact that video image data in the video buffer is inherently available for current display confirms this interpretation of the prosecution history. Because the host computer may or may not include a monitor, the Court does not adopt "currently displayed" and instead uses "currently available for display."

Additionally, the Court's construction stating that image information "is stored in memory" is supported by the plain and ordinary meaning of buffer. The parties agree that video buffer is commonly understood to connote memory. *See* Defs.' Br. 39; *see* Accolade's Mot. to Recons. Prelim. Claim Constructions 4-5. Thus, the plain and ordinary meaning of buffer is used to construe the claim term. Accordingly, the Court construes "video buffer image within said host computer" as "video image data that is stored in memory within the host computer and is currently available

for display."[7]

**web page**

Claims 1 and 16 contain the term "web page." Accolade contends "web page" should be given its plain and commonly understood meaning and does not need construction. Alternatively, Accolade argues that the term means "a page which when opened in a web browser on a computer can display text, images or links to the addresses of other pages or locations on a network, such as the internet or an intranet." Citrix contends that "web page" means "a software created 'object' including an interface written in HTML which permits text and images to be presented via a web browser to a computer system that is coupled to or part of the Internet."

The parties dispute whether a "web page" is "a software created object including an interface written in HTML." The patentee acted as his own lexicographer and defined "web page" in the specification. The specification states, "A web page is a software constructed 'object' including an interface written in HTML which permits text and images to be presented to a computer system that is coupled to or part of the Internet." Col. 6:6-9. Thus the specification defines "web page," and thereby resolves the parties' disagreement.

However, the Court does not construe "web page." The definition for "web page" provided in the specification is consistent with the web page that is commonly known to a layperson. As such, lay jurors would be familiar with "web page," and a construction is not necessary. Furthermore, using the definition for "web page" provided in the specification would only lead to confusion about an already well understood term. Thus, the Court does not construe web page.

---

[7]No dispute exists as to the remaining language used in the Court's construction, "within the host computer," or "video image," which are taken directly from the claim language.

**host computer is initially accessed by said client computer through a web page**

Claim 1 contains the term "host computer is initially accessed by said client computer through a web page." Accolade contends that the term should be given its plain and commonly understood meaning and does not need construction. Alternatively, Accolade argues that "host computer is initially accessed by said client computer through a web page" means "client computer first interacts with the host computer by means of a web page." Citrix contends that the term means "the client computer first accesses the host computer via a web page by obtaining the internet address of the host computer from the web page." The parties dispute the meaning of "accessed" and whether the client computer must obtain the host computer's IP address.

"Host computer is initially accessed by said client computer through a web page" does not require construction. The terms, "host computer," "access,"[8] "client computer," and "web page" have been addressed above. Also, "initially" is a commonly understood word, and the intrinsic record does not contradict the commonly understood meaning of "initially." Thus, no terms in "host computer is initially accessed by said client computer through a web page" require further construction.

The remaining issue is whether the client computer must obtain the host computer's IP address. Citrix argues that the client computer must obtain the host computer's IP address because the IP address is required for the client and host computers to bypass the web page and communicate directly. However, claim 1 states that the client and host computers can communicate "directly or indirectly." Col. 14:10-11. Because the client and host computers can communicate indirectly, they

---

[8]The Court addressed and resolved the parties' dispute about "access" in its discussion on "controlling a computer" and "host computer . . . being capable of being accessed by said client computer."

may communicate, for example, through a server that does not require transmission of the IP address. Furthermore, dependent claim 4 states that the "address" of the host computer is transmitted, creating a presumption that the independent claim does not include the limitation. Col. 14:22-24; *Phillips*, 415 F.3d at 1314-15. This presumption cannot be successfully rebutted in light of the claim language that expressly indicates that the client and host computers can communicate directly or indirectly. Thus, claim 1 does not require that the client computer obtain the host computer's IP address.

## TCP/IP protocol data packet

Claim 1 contains the term "TCP/IP protocol data packet." Accolade contends that "TCP/IP protocol data packet" should be given its plain and commonly understood meaning and does not need construction. Alternatively, Accolade argues that the term means "units of data transmitted in compliance with the TCP/IP protocol between computers on a network." Citrix contends that "TCP/IP protocol data packet" means "a data packet constructed, transmitted, and received according to the Transmission Control Protocol/Internet Protocol format."

In light of the intrinsic record, the Court construes "TCP/IP protocol data packet" as "packets of data in compliance with the Transmission Control Protocol/Internet Protocol ('TCP/IP')." The specification refers to TCP/IP protocol data packets, stating, "The construction and use of TCP/IP protocol networks such as the Internet and private Intranets, and the TCP/IP protocol data packets (or simply 'TCP/IP data packets') sent over such networks, is well known to those skilled in the art." Col. 5:13-17. Thus the specification refers to "TCP/IP protocol data packet" as having its ordinary and customary meaning that is well understood by those skilled in the art. Elaborating on the ordinary and customary meaning, the parties agree that the TCP/IP protocol governs the way that

TCP/IP protocol data packets are transmitted.  Accordingly, transmission of TCP/IP data packets is in compliance with the TCP/IP protocol.  Thus, the Court construes "TCP/IP data packets" as "packets of data in compliance with the Transmission Control Protocol/Internet Protocol ("TCP/IP").[9]

**said client computer and said host computer communicate directly or indirectly with TCP/IP protocol data packets over said TCP/IP protocol network after a connection between said host computer and said client computer has been established**

Claim 1 contains the term "said client computer and said host computer communicate directly or indirectly with TCP/IP protocol data packets over said TCP/IP protocol network after a connection between said host computer and said client computer has been established."  Accolade contends that the term means "after connected, the host and client computers exchange information directly or indirectly over the network with TCP/IP data packets."  Citrix contends that the term means "the client computer and the host computer exchange TCP/IP protocol data packets with each other using a TCP/IP connection established between the host computer and the client computer."

This term does not require construction.  The Court has construed "client computer" as "a computer accessing the host computer" and "TCP/IP protocol data packet" as "packets of data in compliance with the Transmission Control Protocol/Internet Protocol ('TCP/IP')."  Also, "host computer" does not require construction as previously discussed.  The other words and phrases in the term, "communicate directly or indirectly, "over said TCP/IP protocol network,"  "after a connection," "between," and "has been established," all can be readily understood by lay jurors.  While TCP/IP protocol network has not been construed, lay jurors would understand that this refers

---

[9]The parties do not dispute that "TCP/IP" is an acronym for Transmission Control Protocol/Internet Protocol.

to a type of network, namely a TCP/IP network, in which communication occurs with TCP/IP protocol data packets. Accordingly, the Court does not construe the claim term.

The parties dispute whether the client and host computers exchange specifically TCP/IP protocol data packets or information generally. However, a dispute about what is exchanged does not arise from the parties' proposed constructions. Both Accolade's and Citrix's constructions indicate that the exchange between the client and host computers occurs with TCP/IP protocol data packets. For clarification, the "things" that the host and client computers exchange are TCP/IP protocol data packets. This is supported by the claim language itself, which states that the client and host computers "communicate . . . with TCP/IP protocol data packets." Col. 14:10-11.

Accolade expresses doubt that Citrix accepts that the claim term allows for both direct and indirect communication between the client and host computers. For clarification, "said client computer and said host computer communicate directly or indirectly with TCP/IP protocol data packets over said TCP/IP protocol network after a connection between said host computer and said client computer has been established," includes the client and host computers communicating both directly and indirectly. This is clearly stated in the claim term itself, and Citrix stated that it does not object to this reading. Accolade is concerned that Citrix is attempting to qualify "indirectly" to mean only "through, for example, the web page used to initially access the host." *See* Defs.' Br. 40 n.13. However, Citrix only mentioned the qualification in a footnote without any support, and the Court accordingly does not construe "indirectly" with Citrix's qualification. *See id.*

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. The Court **DENIES** Accolade's Motion to Reconsider Preliminary Claim

Constructions.  For ease of reference, the Court's claim constructions are set forth in a table in Appendix B.  The claims with the disputed terms in bold are set forth in Appendix A.

**So ORDERED and SIGNED this 1st day of May, 2009.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

# APPENDIX A

What is claimed is:

1. An apparatus for remotely **controlling a computer** comprising:

a TCP/IP protocol network;

a **client computer** coupled to said TCP/IP protocol network, said **client computer** having a monitor, a keyboard, and a pointing device, said **client computer** running a browser program displaying a browser window on said monitor, said browser program being capable of navigating among **web pages** over said TCP/IP protocol network, said **client computer** further being capable of running a **client program**, said **client program being delivered** to said **client computer** over said TCP/IP protocol network, said **client program** encrypting event data and transmitting said **encrypted event data** over said TCP/IP protocol network, said **encrypted event data** including an input device event created by at least one of said keyboard and said pointing device; and

a **host computer** coupled to said TCP/IP protocol network and **being capable of being accessed by said client computer**, said **host computer** being capable of receiving and decrypting **encrypted event data** and placing said decrypted event data in an **event queue** of said **host computer**, said **host computer** running a **host program** that is responsive to said keyboard and said pointing device due to the event data in the **event queue**, said **host program** encrypting image information and transmitting said encrypted image information over said TCP/IP protocol network for subsequent display by said **client computer** after decryption of received encrypted image information by said **client program**, said image information including a portion of a **video buffer image within said host computer**;

wherein said **host computer is initially accessed by said client computer through a web page** accessible over said TCP/IP protocol network, and wherein **said client computer and said host computer communicate directly or indirectly with TCP/IP protocol data packets over said TCP/IP protocol network after a connection between said host computer and said client computer has been established**.

2. An apparatus for remotely **controlling a computer** as recited in claim 1 wherein said TCP/IP protocol network is at least one of the Internet and an Intranet.

3. An apparatus for remotely **controlling a computer** as recited in claim 1 wherein said **client program** is a Java Applet program.

4. An apparatus for remotely **controlling a computer** as recited in claim 1 wherein said **client program** is transmitted to said **client computer** over said TCP/IP protocol network along with the address of said **host computer**.

5. An apparatus for remotely **controlling a computer** as recited in claim 1, wherein said **host computer** and said **client computer** each have an operating system selected from the group including Macintosh, Microsoft Windows, Microsoft Windows NT, and UNIX operating systems.

6. An apparatus for remotely **controlling a computer** as recited in claim 1 wherein a correct password from said **client computer** is required for it to access the functionality of said **host computer**.

7. An apparatus for remotely **controlling a computer** system as recited in claim 1 wherein said **host computer** provides access information concerning its accessibility by a **client computer**.

8. An apparatus for remotely **controlling a computer** system as recited in claim 1 wherein said **host computer** provides at least one of view only information and view-and-control information to said **client computer**.

9. An apparatus for remotely **controlling a computer** system as recited in claim 1 wherein access information with regards to said **host computer** is displayed by said client machine.

10. An apparatus for remotely **controlling a computer** system as recited in claim 1 wherein said browser program frames at least a portion of said image information displayed on said **client computer** system.

11. An apparatus for remotely **controlling a computer** system as recited in claim 1 wherein said client machine can pan said image information displayed on said **client computer**.

12. An apparatus for remotely **controlling a computer** system as recited in claim 1 wherein said client machine can pan its display at least one of horizontally and vertically.

13. An apparatus for remotely **controlling a computer** system as recited in claim 1 further comprising a server coupled to said TCP/IP protocol network to provide an introduction between said **host computer** and said **client computer**.

14. An apparatus for remotely **controlling a computer** system as recited in claim 1 wherein the availability of said **host computer** is advertised over said TCP/IP protocol network.

15. An apparatus for remotely **controlling a computer** system as recited in claim 1 wherein said client machine indicates to a server coupled to said TCP/IP protocol network that it wishes to be connected with said **host computer**.

16. An apparatus for remotely **controlling a computer** system as recited in claim 1 wherein said **web page** accessible over said TCP/IP protocol network is hosted by a server coupled to said TCP/IP protocol network.

17. An apparatus for remotely **controlling a computer** system as recited in claim 1 wherein a user of said **client computer** uses an access parameter to access said **host computer**.

18. An apparatus for remotely **controlling a computer** system as recited in claim 1 wherein a plurality of **client computer**s are coupled to said **host computer**.

## APPENDIX B

| Term | Definition |
|------|------------|
| "controlling a computer" | taking over the functionality of the host computer that is responsive to an input device event received from a client computer |
| "client computer" | a computer accessing the host computer |
| "client program" | a set of instructions for execution by a client computer |
| "being delivered" | [no construction necessary] |
| "encrypted event data" | event data coded to be unintelligible without decoding information, commonly a key or a password |
| "host computer" | [no construction necessary] |
| "host computer . . . being capable of being accessed by said client computer" | [no construction necessary] |
| "event queue" | event data waiting to be processed on a computer |
| "host program" | a set of instructions for execution by the host computer |
| "video buffer image within said host computer" | video image data that is stored in memory within the host computer and is currently available for display |
| "web page" | [no construction necessary] |
| "host computer is initially accessed by said client computer through a web page" | [no construction necessary] |
| "TCP/IP protocol data packet" | packets of data in compliance with the Transmission Control Protocol/Internet Protocol ("TCP/IP") |
| "said client computer and said host computer communicate directly or indirectly with TCP/IP protocol data packets over said TCP/IP protocol network after a connection between said host computer and said client computer has been established" | [no construction necessary] |